IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2019

## IN RE JANIYAH J., ET AL.[1]

### Appeal from the Juvenile Court for Hamilton County
### Nos. 281780; 281781; 281782     Robert D. Philyaw, Judge

_____

#### No. E2018-02006-COA-R3-PT

_____

This action involves the termination of a father's parental rights to his minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the statutory ground of severe child abuse and that termination was in the best interest of the children.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which RICHARD H. DINKINS and ARNOLD B. GOLDIN, JJ., joined.

Robert B. Pyle, Chattanooga, Tennessee, for the appellant, Jermichael J., Sr.

Herbert H. Slatery, III, Attorney General & Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I.     BACKGROUND

Janiyah, Areial, and Jermichael, Jr. (collectively "the Children") were born to Desanta D. ("Mother") and Jermichael J., Sr. in August 2010, July 2012, and May 2014, respectively.  Mother and Father ("the Parents") resided together with the Children in a

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

one-bedroom motel suite in Chattanooga.  The front room was converted into a bedroom for the Parents, while the Children shared the one bedroom.

On February 20, 2015, the Tennessee Department of Children's Services ("DCS") received a referral with allegations of lack of supervision and drug exposure.  This was not the first referral in which DCS investigated the Parents and their care of the Children.  Jennifer Lambert, a DCS investigator, visited the home on March 2, 2015, and found Mother alone with the Children and the home in disarray with chemicals, clothing, trash, food, empty cans, and other items strewn about.  Mother admitted use of marijuana and submitted to a drug screen that confirmed her admission.  Ms. Lambert advised Mother to inform Father of the visit and to clean the home before she returned in one week.

Ms. Lambert returned on March 9.  Mother had made significant progress at that time; however, Ms. Lambert provided Mother with additional information for resources to assist her further in her care of the Children.

Thereafter, DCS received another referral on April 27 with new allegations of environmental neglect and drug exposure.  Ms. Lambert, along with another investigator, returned on April 28.  Ms. Lambert found Mother alone with the Children again.  The home was in disarray, and the Children were confined to their bedroom.  The bedroom was "filthy" and "cluttered," and Jermichael, Jr. had a soiled diaper, with "feces running down the sides of his legs" and "up his back."  Ms. Lambert questioned Mother about the living conditions and reminded her that she had agreed to accept services and complete certain tasks.  Mother admitted her lack of effort and also that she would test positive for marijuana.  Ms. Lambert advised Mother that she would return.

Ms. Lambert attempted a visit in May 2015; however, no one answered the door.  She returned on June 15.  Again, no one answered the door; however, Ms. Lambert asked the motel office to call Mother's room.  Mother answered.  At that point, Ms. Lambert requested police assistance, and once enforcement arrived, she observed Mother standing in the hallway outside the residence.  Mother gave permission to enter the home, which emitted a strong odor of urine and feces.  Ms. Lambert found the Children in the bedroom, which was covered in feces, garbage, and roaches.  The Children were also covered in feces.  At some point, Father arrived and was shown the Children's living conditions.  He explained that he worked seven days per week and was unaware of the state of the Children's bedroom.  Mother was arrested, and the Children were taken to the hospital.[2]

---

[2] The family's room was voluntarily condemned by the motel, and it took approximately three weeks to clean the room sufficiently to recertify it for occupancy.

Once at the hospital, the Children were cleaned and examined. Medical personnel shaved Janiyah and Areial's hair because their hair was matted with feces and could not be adequately cleaned, despite persistent attempts to remove the fecal matter. Jermichael, Jr. was diagnosed with Rickett's, and Areial's bones showed signs of demineralization. All three children also tested positive for marijuana. Janiyah and Areial were later diagnosed with severe developmental delays. The girls were placed in the same foster home at the time of removal. Jermichael, Jr. later joined them on February 2, 2018.

The Parents were charged with three counts of aggravated child neglect. They pled guilty, and received sentences of probation. The Children were adjudicated as dependent and neglected. The Hamilton County Juvenile Court also found the Parents guilty of severe abuse by final order, entered on March 24, 2017. The order was appealed to the Circuit Court; however, an agreed order was entered dismissing the appeal on December 1, 2017.

Meanwhile, DCS developed a permanency plan in which the Parents were tasked with various responsibilities, including refraining from drug use, completing an alcohol and drug assessment and a mental health assessment, submitting to random drug screens, securing and maintaining stable housing and income, and ensuring that the home was free from environmental concerns and other issues.

On March 12, 2018, DCS filed a petition to terminate Father's parental rights based upon the statutory ground of severe child abuse.[3] The case proceeded to a hearing, at which several witnesses testified. As pertinent to this appeal, Ms. Lambert testified that there were five prior investigations concerning the family before the current investigation that began in February 2015. She admitted that she did not call Father prior to the Children's removal on June 15 but explained that Mother advised her that they did not have cellular telephones. She recalled that Father arrived during the removal process. At that time, he admitted that the current living environment was uninhabitable and inhumane. He further acknowledged that he also lived in the residence and had been advised of her prior visits.

Mother testified that she was currently not in a position to care for the Children but claimed that Father was ready and willing to assume responsibility for them. She believed he could provide appropriate care for them. She asserted that he provided for them prior to their removal and interacted with them when he came home from work. She stated that he currently lived with his grandmother in a nice neighborhood.

---

[3] DCS also sought and obtained the termination of Mother's rights. She is not a party to this appeal.

Father confirmed that he lived with his grandmother and has resided there since 2015. He stated that he was working 8 to 12-hour shifts at the time of the Children's removal. He alleged that Mother was "always cleaning" when he arrived home after his shifts. He claimed that he always smelled bleach and that the residence was always clean when he returned home. He stated that on June 15, he left for work around 5:30 a.m. and returned around 3:30 p.m. He agreed that the residence was "a little messed up" that week and claimed that he advised Mother to "get everything together" and that they had cleaned some that morning. He claimed that the fecal matter strewn throughout the residence looked like "candy" to him and that the stains on the mattress were caused by juice. He also denied knowledge of Mother's marijuana use in the home. He admitted that he knew she smoked marijuana but claimed that he advised her not to smoke marijuana in the home while caring for the Children.

Father admitted that Mother could not provide appropriate care for the Children. He claimed that he was unaware of her need for mental health treatment prior to removal but that he was ready and willing to care for the Children in her stead. He believed he also had an adequate support system to assist him in caring for them. He stated that he had housing and employment that would allow him to provide for them. He asserted that he was current with his child support obligation.

Father acknowledged that the Children had been in foster care for three years. He admitted that the Children were doing well as evidenced by their appearance at visitation. He claimed that he had maintained a meaningful relationship with them since their removal and asserted that they even asked him if they could come home with him during visitation. He provided that he attended visitation on a weekly basis until he obtained new employment and experienced a change in his schedule, causing him to miss a few visits. He believed he has attended 20 visitations since April 2018.

Crystal Morris, a DCS employee, stated that she was assigned to the Children's case at the time of removal and assisted them until March 15, 2018, when the case was transferred to another worker. She recalled that Father participated in the development of the permanency plan and that she provided him with the appropriate resources to complete the requirements. She explained that DCS was later relieved of making reasonable efforts in April 2017 as a result of the court's finding of severe abuse. She admitted that Father had completed some requirements, including submitting to random drug screens and completing parenting classes. However, she believed Father still did not have suitable housing for the Children. She stated that she attempted a home visit to Father's residence with his grandmother but that no one was at the residence at that time. She recalled that Father last advised her that he was attempting to secure housing for himself and the Children but that his plans had fallen through.

Ms. Morris testified that Father was provided supervised visitation with the Children at a public place on a weekly basis. She recalled that Father did not redirect the Children when they became loud and that most times, he and Mother provided unhealthy snacks for the Children during visitation. She agreed that the Children interacted with the Parents as "mom" and "dad" but that they no longer asked for them when visitation was over. She explained,

> They would respond to them as Mom and Dad. They interacted with them during the visits. When it was time to leave the visits, the [Children] would get in the car. The [Parents] would ensure that the [Children] were in their seatbelts and . . . tell them bye. But as soon as we leave, the [Children] were like, we're going home to [Foster Mother]. So there was no more mention of Mom and Dad, it was [Foster Mother].

She stated that Father had missed some visitation due to work obligations.

Ms. Morris testified that the Children were doing well in their current placement and had bonded with their foster family. She stated that the Children had also progressed and shown improvement since the time of removal.

Erica Little, also employed by DCS testified that she was assigned to the Children's case in March 2018 in Ms. Morris's stead. She confirmed that the Children had bonded with their foster family and asserted that they were housed in a nurturing and loving environment. She claimed that the Parents had missed 23 of 27 visits since March 2018. She claimed that she often transported the Children to the visit only to find that the Parents were unable to attend. She recalled that the younger children were "numb" to the Parents' failure to appear but that the oldest child, Janiyah, seemed upset. She asserted that the Parents had little to no interaction with the Children when the visitations actually occurred as scheduled. She explained that they either watched the Children or were on their cellular telephone. She claimed that the Parents took offense when she directed them to interact with the Children. She recalled that the Parents also exhibited poor hygiene during visitation and that other patrons of the restaurant complained.

Foster Mother testified concerning her loving relationship with the Children and their integration into her home. She expressed a desire to adopt them if they were to become available for adoption. She claimed that the Children had progressed since their placement in their home and had bonded with the rest of the family. She confirmed that Janiyah seemed upset when the Parents did not attend visitation as scheduled.

Father denied Ms. Little's claim concerning visitation and testified that he attended 17 or 18 visits since March 2018. He claimed that visitation was cancelled by

DCS on at least two occasions and that he has missed some visitation due to his work responsibilities. Ms. Little testified in rebuttal that Father attended approximately four visitations, including one two-hour visitation that was scheduled as a result of her cancellation of a prior visit. She further claimed that he either cancelled or did not appear 12 times since March 21, 2018, and that her records were incomplete for the remainder of the scheduled dates.

Following the hearing, the trial court granted the termination petition, finding that Father had committed severe child abuse as found by the final adjudicatory order, entered on March 24, 2017, and that termination was in the best interest of the Children. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues on appeal as follows:

A. Whether clear and convincing evidence supports the court's termination based upon a finding of severe child abuse pursuant to Tennessee Code Annotated section 36-1-113(g)(4).

B. Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process

requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1)  [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2)  [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as

- 7 -

supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV.   DISCUSSION

### A.

The trial court may terminate parental rights based upon a finding of severe child abuse either as found "under any prior order of a court" or as "found by the court hearing the petition to terminate parental rights." Tenn. Code Ann. § 36-1-113(g)(4). Here, the trial court found clear and convincing evidence in support of this statutory ground of termination based upon the adjudicatory order, dated March 20, 2017, and later amended on March 24, 2017, in which Father was found to have committed severe child abuse against all three children. Father does not appear to challenge the court's reliance upon the prior order. Instead, he again feigns ignorance as to the Children's living conditions and extreme neglect.

The adjudicatory order is a final order regarding the disposition of the Children as dependent and neglected on the ground of severe child abuse. Father appealed the finding but later dismissed the appeal pursuant to an agreed order. A court may apply "the doctrine of res judicata to prevent a parent from re-litigating whether [he] committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). The finding of severe abuse is "a final decision, which the [parent] is barred from challenging" when the parent had a full and fair opportunity to litigate the issue of severe abuse in the prior suit and did not appeal. *State Dep't of Human Servs. v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995). Accordingly, the order became a final order and may be relied upon pursuant to Tennessee Code Annotated section 36-1-113(g)(4). With these considerations in mind, we uphold the court's finding of severe child abuse.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[4]
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> >
> > (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> >
> > (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may

---

[4] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

We acknowledge Father's love and concern for the Children and his steady employment history and willingness to provide for them. However, the fact remains that Father had not obtained suitable housing for the Children in the three years since the time of removal. Tenn. Code Ann. § 36-1-113(i)(1). Questions also remain as to whether he is capable of providing a suitable environment for them as evidenced by his failure to acknowledge his own neglect of their well-being prior to removal. Tenn. Code Ann. § 36-1-113(i)(6), (7). Meanwhile, the Children have bonded with their foster family and are thriving. A change of caretakers at this point in the Children's life would be detrimental to them. Tenn. Code Ann. § 36-1-113(i)(5). They should be allowed to achieve permanency and stability in their current home. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Children. We affirm the trial court.

## V.    CONCLUSION

The judgment of the trial court is affirmed.  The case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Jermichael J., Sr.

_____
JOHN W. McCLARTY, JUDGE